1

2

3

4

5

6

7

8

9                         UNITED STATES DISTRICT COURT

10

11   UDI FISHMAN,                              No.  2:13-cv-02421-GGH

12                  Petitioner,

13          v.                                 ORDER[1]

14   GARY SWARTHOUT,

15                  Respondent.

16

17   INTRODUCTION AND SUMMARY

18          Petitioner is a state prisoner proceeding *pro se* with a petition for a writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254.  He was convicted of burglary, attempted false imprisonment,

20   unlawful use of tear gas, and possession of a deadly weapon.  Petitioner was sentenced to a prison

21   term of 5 years.  Petitioner challenges his conviction on the following grounds: 1) the trial court's

22   failure to give a unanimity instruction on his burglary charge violated the Sixth and Fourteenth

23   Amendments; 2) the trial court's exclusion of impeachment evidence violated petitioner's Sixth

24   and Fourteenth Amendment rights; 3) the trial court's ruling preventing disclosure of emails

25   between a witness and her attorney violated his Sixth and Fourteenth Amendment rights; and 4)

26   the trial court's restitution order violated his due process rights.  Respondent has filed an answer

27   ─────────────────────

28   [1]  Both parties have consented to have the undersigned preside in this case pursuant to 28 U.S.C. section 636(c).

                                    1

1    and petitioner has filed a traverse and a motion for discovery.  (ECF Nos. 18, 26.)  Upon careful

2    consideration of the record and the applicable law, the court denies the petition and denies

3    petitioner's motion for discovery.

4    BACKGROUND

5            In its unpublished memorandum and opinion affirming petitioner's judgment of

6    conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

7    following factual summary:

> Juan Trejo first met defendant in 1998, when defendant solicited a
> bid from Juan to build a 340–foot–long retaining wall on
> defendant's property in Los Gatos.[N.1] After Juan built the wall,
> he continued to do various work for defendant over the years. In
> 2006, he rebuilt the wall after a big part of it collapsed. Juan and
> defendant thereafter were involved in litigation involving an
> engineering firm and the manufacturers of the stone used in the
> wall. The litigation ultimately settled in 2009, with Juan receiving
> $540,000 and defendant receiving $290,000. (The money paid to
> Juan was apparently for amounts defendant owed him for
> rebuilding the wall.)
>
> > [N.1] We refer to Juan by his first name to distinguish him
> > from his wife, Christine Trejo, to whom we will also refer
> > by her first name.
>
> After the settlement, the relationship between Juan and defendant
> deteriorated. Juan claimed he loaned defendant $45,000, but then
> refused to give defendant any more money after defendant said he
> needed "all of it" and that "everybody got rich, except me."
> Defendant claimed that work remained for Juan to do on his
> property and the $45,000 Juan gave him was not a loan but
> repayment for sums defendant had advanced to Juan's employees
> on Juan's behalf while the wall was being rebuilt.
>
> On September 16, 2009, Juan's wife, Christine, was at their home in
> Placer County with her brother-in-law, George Obregon; Juan was
> working in the Bay Area. A van with what turned out to be fake PG
> & E magnetic placards on the side drove onto the property and
> around to the back of the house. It was later determined that the van
> had mismatched license plates on it, both of which belonged to
> other vehicles. Defendant was the driver.
>
> Upon seeing the van, Christine went out the back door and
> approached the van. Defendant, who was wearing sunglasses, an
> orange safety vest, and a hat, told Christine he was there to do an
> audit. She told him to stay there, she was going to get her husband,
> but as she walked back toward the house she discovered he was
> following her. When she told him to stay there again, he told her he
> had left the audit in the van and he had to go get it.

From the house, Christine watched defendant get back in the van and start to drive off. She locked the door and called out to Obregon, who was in the bathroom. She watched as defendant appeared to be driving off the property but then stopped, parked the van again, and this time approached the front of the house. Christine went to the front door and saw defendant approaching the front stairs with a red canister in his hand. As she yelled at him to get rid of the canister, he came up to her, telling her that if she would hold the audit he would get rid of the canister. As she reached to take the audit from him, he sprayed her in the face with pepper spray. She stepped back and screamed for Obregon to help her. Then she turned and tried to run, but fell to the floor. Defendant followed her into the house, and when Obregon came out, approached defendant, and asked him what was going on, defendant sprayed Obregon in the face with the pepper spray as well. A struggle between the two men ensued, and in an attempt to get defendant off Obregon, Christine hit defendant with a bottle and then stabbed him with a knife. She then ran outside and called 911. While waiting for the police, she got in the van and saw cardboard laid down in the back, along with some rope. A wooden table leg altered with a weighted end and a tennis ball covering the end was later found in the van.

Defendant was ultimately charged with attempted murder, burglary, attempted kidnapping, two counts of unlawful use of tear gas, and possession of a deadly weapon (the table leg). At trial, he admitted going to the Trejos' house in disguise, but he claimed it was only so Juan would come open the gate so they could talk. He also testified that when he came to the front door, Christine suddenly raised her hand with a knife in it and stabbed him in the forearm. He claimed the pepper spray discharged when he was trying to defend his face from Christine's attack. He also claimed that Christine then ran into the house, and when he stepped in the house to see who she was talking to, Obregon lunged at him and knocked him down. He testified that he probably pressed the trigger on the pepper spray again "by reflection" when Obregon knocked him down.

The jury acquitted defendant of attempted murder and attempted kidnapping but convicted him of burglary, attempted false imprisonment (a lesser included offense of attempted kidnapping), both counts of unlawful use of tear gas, and possession of a deadly weapon. The trial court sentenced defendant to five years in prison. Defendant timely appealed.[N.2]

> [N.2] We consolidated defendant's appeal from the judgment (case No. C067955) with his later appeal from a postjudgment restitution order (case No. C069267). On appeal, defendant has not raised any issue regarding the restitution order, so we will affirm that order without further discussion.

People v. Fishman, 2013 WL 542032, at **1–2 (February 8, 2013). The California Court of

Appeal affirmed the judgment. Id. at *9. On March 18, 2013, petitioner filed a petition for

1    review with the California Supreme Court, which was summarily denied on May 15, 2013.

2    Resp't's Lod. Docs. 5, 6.  Petitioner filed his federal petition for writ of habeas corpus in this

3    court on November 21, 2013.  ECF No. 1.

4    DISCUSSION

5    I.      AEDPA Standards

6        The statutory limitations of federal courts' power to issue habeas corpus relief for persons

7    in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

8    Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

9

10            An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

11

12            (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

13

14            (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

15

16        As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

17    2254(d) does not require a state court to give reasons before its decision can be deemed to have

18    been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).  Rather,

19    "when a federal claim has been presented to a state court and the state court has denied relief, it

20    may be presumed that the state court adjudicated the claim on the merits in the absence of any

21    indication or state-law procedural principles to the contrary."  Id. at 784–85, citing Harris v.

22    Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when it

23    is unclear whether a decision appearing to rest on federal grounds was decided on another basis).

24    "The presumption may be overcome when there is reason to think some other explanation for the

25    state court's decision is more likely."  Id. at 785.

26        The Supreme Court has set forth the operative standard for federal habeas review of state

27    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

28    application of federal law is different from an *incorrect* application of federal law.'"  Harrington,

1    131 S.Ct. at 785, citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).  "A state

2    court's determination that a claim lacks merit precludes federal habeas relief so long as

3    'fairminded jurists could disagree' on the correctness of the state court's decision."  <u>Id.</u> at 786,

4    citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

5            Accordingly, "a habeas court must determine what arguments or theories supported or . . .

6    could have supported[] the state court's decision; and then it must ask whether it is possible

7    fairminded jurists could disagree that those arguments or theories are inconsistent with the

8    holding in a prior decision of this Court."  <u>Id.</u>  "Evaluating whether a rule application was

9    unreasonable requires considering the rule's specificity.  The more general the rule, the more

10   leeway courts have in reaching outcomes in case-by-case determinations.'"  <u>Id.</u>  Emphasizing the

11   stringency of this standard, which "stops short of imposing a complete bar of federal court

12   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

13   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

14   was unreasonable."  <u>Id.</u>, citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

15          The undersigned also finds that the same deference is paid to the factual determinations of

16   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

17   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

18   decision that was based on an unreasonable determination of the facts in light of the evidence

19   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

20   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – *i.e.*, the

21   factual error must be so apparent that "fairminded jurists" examining the same record could not

22   abide by the state court factual determination.  A petitioner must show clearly and convincingly

23   that the factual determination is unreasonable.  <u>See</u> <u>Rice v. Collins</u>, 546 U.S. 333, 338, 126 S.Ct.

24   969, 974 (2006).

25          The habeas corpus petitioner bears the burden of demonstrating the objectively

26   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

27   <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

28   show that the state court's ruling on the claim being presented in federal court was so lacking in

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786–787. "Clearly

established" law is law that has been "squarely addressed" by the United States Supreme Court.

Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008). Thus, extrapolations of

settled law to unique situations will not qualify as clearly established. See e.g., Carey v.

Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653–54 (2006) (established law not permitting state

sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

established law when spectators' conduct is the alleged cause of bias injection). The established

Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

federal courts. Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

When a state court decision on a petitioner's claims rejects some claims but does not

expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S.Ct. 1088, 1091

(2013). However, if the state courts have not adjudicated the merits of the federal issue, no

AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law.

Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

The state courts need not have cited to federal authority, or even have indicated awareness

of federal authority in arriving at their decision. Early, 537 U.S. at 8, 123 S.Ct. at 365. Where

the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

federal court will independently review the record in adjudication of that issue. "Independent

review of the record is not *de novo* review of the constitutional issue, but rather, the only method

by which we can determine whether a silent state court decision is objectively unreasonable."

Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

II.     Unanimity Instruction

Petitioner contends the trial court's failure to give a unanimity instruction on his burglary

charge violated his Sixth and Fourteenth Amendment rights. The California Court of Appeal

6

rejected this claim as follows:

> Defendant contends the trial court erred in failing to instruct the jurors that they had to unanimously agree on which act constituted the entry necessary to convict him of burglary and on what felony he intended to commit when he entered. We disagree on both points.

> "In a criminal case, a jury verdict must be unanimous.... Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' ... [¶] On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.] The crime of burglary provides a good illustration of the difference between discrete crimes, which require a unanimity instruction, and theories of the case, which do not. Burglary requires an entry with a specified intent.[N.8] (Pen.Code, § 459.) If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts. If, however, the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132–1133.)

>> [N.8] The required intent is the intent to commit larceny or any felony. (Pen.Code, § 459; *People v. Yarbrough* (2012) 54 Cal.4th 889, 892.)

> The foregoing passage from *Russo*, which defendant acknowledges, disposes of the latter half of his unanimity argument. He insists, however, that it does not. Specifically, he "does not dispute this state of the law as it relates to the crime of general offense burglary," but he argues that "the state of the evidence as to [his] use of the pepper spray and the entry into the house required the giving of a unanimity instruction ... to ensure that all the jurors agreed on the specific felonious intent underlying the burglary charge." He contends that is so in this case because "there was not sufficient evidence to support a finding that [he] entered the house with intent to commit ... attempted kidnapping," and therefore "the verdict on the burglary count was necessarily predicated on a finding that [he] entered with the intent to unlawfully use pepper spray," but "there were two instances of [his] use of pepper spray"—one at the threshold (against Christine) and one inside the

house (against Obregon). He contends that if Christine's testimony is credited, the first use of pepper spray occurred when he had not yet entered the house, which left only the theory that he entered the house with the intent to use the spray again, which he contends was not supported by sufficient evidence. From this line of reasoning, he concludes that the jury was misled because "the jury was instructed that [it] did not need to agree on the underlying intent."

Frankly, we cannot make any sense whatsoever of the foregoing argument. *Russo* makes clear that no unanimity instruction is necessary on the felonious intent element of burglary, and it admits of no exception. On the evidence here, and in light of the jury's verdicts, it appears the jurors decided that defendant entered the Trejos' house with the intent to unlawfully use the pepper spray he was carrying. Whether there was sufficient evidence that defendant harbored that intent, under *Russo* no unanimity instruction was required on the intent element of the burglary charge. Accordingly, the latter half of defendant's unanimity argument is without merit.

We reach the same conclusion with respect to the first half of his unanimity argument—that the jurors should have been instructed they had to unanimously agree on what act constituted the entry for purposes of the burglary charge. Defendant bases this argument on the premise that "there were two separate and distinct acts upon which the prosecutor based the burglary charge: 1) the spraying of [Christine] while [defendant] stood outside the threshold of the door and some of the spray itself was alleged to have entered the house; and 2) the entry of [defendant] into the house after he sprayed [Christine]." The prosecutor argued no such thing, however.

Defendant's assertion that the prosecutor offered the jury alternative theories of what constituted the entry for purposes of the burglary charge is based on a single statement the prosecutor made to the jury in closing argument, but defendant fails to quote the prosecutor's statement in its entirety. When the prosecutor's entire statement to the jury is considered, it is apparent that he was not distinguishing between two possible manners of entry; rather, he was discussing the intent element of the crime, arguing to the jury that while defendant's "ultimate purpose was ... the intended kidnap or killing of [Christine]," the jury could find that he committed burglary by entering with the intent to unlawfully use pepper spray because of the fact that "he entered th[e] threshold with the pepper spray and then continued, pursued her, and used it again on ... Obregon."

With the prosecutor's argument properly in context, it is apparent that the prosecutor did not offer the jury the choice of two different entries in determining whether defendant committed burglary. Even assuming for the sake of argument, however, that notwithstanding the prosecutor's theory the jury could have chosen between the entry of the pepper spray and the entry of defendant himself as the means of entry, no unanimity instruction was necessary here because, as the People point out, "[a] unanimity instruction is not required where the offenses are so closely connected to form a single transaction." (*People v. Thompson* (1995) 36 Cal.App.4th

8

843, 851.) This exception "'applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' " (*Ibid.*) Such was the case here.

Defendant contends the single transaction exception to the requirement of a unanimity instruction does not apply here because his "conduct was the source of much dispute at trial" and "[i]n setting forth proper jury instructions, the court cannot ignore the defense evidence." While both of these propositions are true, they do not support defendant's conclusion that a unanimity instruction was required. Under the principles explained in Russo, a unanimity instruction was necessary only if the evidence left open the possibility that defendant committed two distinct burglaries and there was a danger that the jury might have found him guilty without agreeing on which burglary he committed. That possibility did not exist here. If the jurors had credited defendant's version of events, they would not have found him guilty of any burglary at all. On the other hand, if the jurors credited the prosecution's evidence—as they did—they could have found him guilty of only one burglary because the two supposed entries were so closely connected in time and space that there was no reasonable basis for the jury to distinguish between them. Under these circumstances, no unanimity instruction was necessary.

Fishman, 2013 WL 542032 at **7–9.

Petitioner repeats the arguments he made on his state court direct appeal here in his federal petition. First, he contends the jury should have been given a unanimity instruction on which act constituted the entry necessary to convict him of burglary. That is, whether the jury relied on petitioner's act of spraying Ms. Trejo while he stood outside the threshold of the door or petitioner's act of physically entering the house. The question of whether a unanimity instruction on this issue was necessary is a matter of state law and thus not a reviewable in a federal habeas proceeding. See Estelle v. McGuire, 502 U.S. 62, 68, 112 S.Ct. 475 (1991). As the California Court of Appeal noted, "where the offenses are so closely connected to form a single transaction," a unanimity instruction is not required. See People v. Thompson, 36 Cal. App. 4th 843, 851 (1995). Furthermore, as a matter of state law, no unanimity instruction is necessary on the felonious intent element of burglary. See People v. Russo, 25 Cal.4th 1124, 1132–33 (2001).

Petitioner also appears to contend, from a federal perspective, that the jury was required to unanimously agree on which felony he intended to commit to satisfy the "intent" requirement of burglary. Distinguishing between the facts necessary to satisfy the required elements of the

charged offense from those facts that show the means by which the elements are established, the

United States Supreme Court has held that juror unanimity is not required with respect to the

theory underlying the criminal charge.  Schad v. Arizona, 501 U.S. 624, 631–32, 649, 111 S.Ct.

2491 (1991) ("We have never suggested that in returning general verdicts the jurors should be

required to agree upon a single means of commission, any more than the indictments were

required to specify one alone.", citing  McKoy v. North Carolina, 494 U.S. 433, 449, 110 S.Ct.

1227 (1990) (Blackman, J., concurring) (There is no constitutional requirement that "the jury

reach agreement on the preliminary factual issues which underlie the verdict.") ; Jeffries v.

Blodgett, 5 F.3d 1180, 1195 (9th Cir.1993) (holding that it is "irrelevant" whether the jurors

unanimously agree on which of the alternative means was employed to commit the crime).  In

Schad, the Supreme Court held that in reaching a verdict of first degree murder, the jury did not

have to unanimously agree whether premeditation or felony murder supplied the requisite element

for the conviction.

        The denial of petitioner's claim by the California Court of Appeal was not an

unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim

is denied.

III.    Evidentiary Rulings

        Petitioner contends his Sixth and Fourteenth Amendment rights had been violated because

the trial court (1) improperly excluded evidence relating to the Trejos's character for truthfulness

and (2) prevented disclosure of emails sent by Ms. Trejo through her work email to her attorney.

Although cloaked in terms of erroneous state evidentiary rulings, petitioner appears to claim that

these errors violated his right to present a defense under Holmes v. South Carolina, 547 U.S. 319,

126 S.Ct. 1727 (2006) and his right to an opportunity for effective cross-examination under Davis

v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, L.Ed.2d 347 (1974).[2]  It appears that some of these

claims were not exhausted.  Nonetheless, the court denies the petition on the merits pursuant to 28

---

[2]  To the extent petitioner claims these evidentiary rulings are erroneous under state law, again,
those claims are not cognizable on federal habeas review.  See Estelle, 502 U.S. at 67 ("[F]ederal
habeas corpus relief does not lie for errors of state law.") (internal quotations and citations
omitted).

1   U.S.C. § 2254(b)(2).

2       A. <u>Applicable Legal Standards</u>

3       A district court may not collaterally review a state court evidentiary ruling unless it

4   violates federal law, either by violating a specific constitutional provision or by infringing upon

5   the due process right to a fair trial. <u>Pulley v. Harris</u>, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d

6   29 (1984). "State and federal rulemakers have broad latitude under the Constitution to establish

7   rules excluding evidence from criminal trials." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324,

8   126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quotations and citations omitted); <u>see</u> <u>also</u> <u>Montana v.</u>

9   <u>Egelhoff</u>, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion) (holding

10  that due process does not guarantee a defendant the right to present all relevant evidence). This

11  latitude is limited, however, by a defendant's constitutional rights to due process and to present a

12  defense, rights originating in the Due Process Clause of the Fourteenth Amendment, and by

13  extension, the Sixth Amendment right to cross-examine using the evidence acquired. <u>Holmes</u>,

14  547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules

15  that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

16  promote, well-established rules of evidence permit trial judges to exclude evidence if its probative

17  value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or

18  potential to mislead the jury." <u>Id.</u> at 326; <u>see also</u> <u>Egelhoff</u>, 518 U.S. at 43 (holding that the

19  exclusion of evidence does not violate the Due Process Clause unless "it offends some principle

20  of justice so rooted in the traditions and conscience of our people as to be ranked as

21  fundamental."). "[T]he Constitution permits judges to exclude evidence that is repetitive, only

22  marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues."

23  <u>Holmes</u>, 547 U.S. at 326–27. The defendant, not the state, bears the burden to demonstrate that

24  the principle violated by the evidentiary rule "is so rooted in the traditions and conscience of our

25  people as to be ranked as fundamental." <u>Egelhoff</u>, 518 U.S. at 47 (internal quotations and

26  citations omitted).

27      Turning to the Sixth Amendment, as the Ninth Circuit has explained in applying Supreme

28  Court authority, the right to cross-examine a witness is not unfettered:

A defendant's right to cross-examine adverse witnesses is not unlimited, though. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." "The Supreme Court has held that a Confrontation Clause violation occurs when a trial judge prohibits any *inquiry* into why a witness may be biased." However when some inquiry is permitted, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination." "No Confrontation Clause violation occurs 'as long as the jury receives sufficient information to appraise the biases and motivations of the witness.'"

Hayes v. Ayers, 632 F.3d 500, 518 (9th Cir. 2011) (internal citations omitted and emphasis original). "'[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness.'" Murdoch v. Castro, 365 F.3d 699, 705 (9th Cir. 2004), quoting Olden v. Kentucky, 488 U.S. 227, 231, 109 S.Ct. 480 (1988). Accordingly, the defendant has met his burden when he has shown that "'[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had ... counsel been permitted to pursue his proposed line of cross-examination.'" Id., quoting Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

With respect to petitioner's claims that he was the denied the opportunity to cross-examine witnesses with information his lawyer already had in his possession, the proper Constitutional amendment to review is the Sixth Amendment. However, the appropriate federal claim for review concerning denial of discovery of some emails is that established by Holmes— the Fourteenth/Fifth Amendments due process right to present a defense. Although the material which petitioner claims was denied him *might* have been used on cross-examination, it is the discovery of the information in the first instance which is at issue. The undersigned will therefore explore the Holmes issue for this latter claim.

B. Analysis

1. Alleged Molestation and Prior Litigation

Petitioner contends his Sixth Amendment right were violated when the trial court excluded evidence that Juan Trejo had been accused of molesting his stepdaughter (Christine

12

Trejo's daughter) and evidence that, in connection with a civil lawsuit filed against them, the Trejos had reneged on a settlement agreement and fraudulently transferred real property prior to filing for bankruptcy.  The Court of Appeal rejected these claims on direct appeal as follows:

A

*Alleged Molestation*

> In their motions in limine, the People sought to exclude evidence that in 1996, Juan had been charged with molesting his stepdaughter (Christine's daughter).  At a preliminary hearing in that case, an investigator had testified that Christine told her that Juan initially denied the molestation but then admitted to Christine that he had touched the alleged victim on the chest and private area. When the investigator talked to Juan, however, he denied touching the alleged victim with any sexual intent. Eventually, the case was dismissed for insufficient evidence. The People told the court that they believed Christine would maintain the molestation never occurred and Juan continued to deny the conduct. The People also noted that while they had not interviewed the alleged victim (who was now an adult), they were informed that the defense had interviewed her and she had recanted her allegations. The People acknowledged that, if proven, the molestation would constitute criminal conduct involving moral turpitude and would therefore be relevant for impeachment purposes, but they argued that the defense should be precluded from offering evidence relating to the alleged molestation because "[r]eference to these matters will necessarily create a mini-trial on the credibility of the allegations."

> For his part, in his motions in limine defendant sought admission of the alleged molestation, arguing that it was relevant to impeach both Juan and Christine. Defendant asserted cursorily that "[t]he admission of this relevant evidence of impeachment ... would not involve an undue consumption of time."

> At the hearing on the in limine motions, defense counsel told the court he was "not going to retry the [molestation] case" and that he intended to prove the molestation "by the law enforcement officer who interviewed the alleged victim ... and ... by the statement of the law enforcement officer that he [sic] took from Christine Trejo." The People responded that retrial of the "whole thing" would be "a necessity" because "[t]hese are huge explosive allegations that are highly prejudicial to anybody if they are thrown out there."

> The trial court ruled that the evidence would not be admitted, concluding that the probative value of the evidence was not going to outweigh its prejudicial effect. The court first suggested that Juan was not a particularly important witness because he "was nowhere near the scene of this particular incident when it occurred." The court then stated that "allowing this issue to be explored is going to be unduly consumptive of the court's time" and "allegations of a sexual nature between an adult male and a juvenile female are explosive and raise prejudices by people, such that it may be

13

difficult for them to focus on what the issues are at hand as opposed to these particular issues." The court observed that the People would "have to essentially relitigate those issues of the sexual abuse allegations which ended up in a dismissal of the charges." The court also observed that it did not "admit a lot of [this type of impeachment] evidence in any circumstance" and that it did not "like" this type of evidence.[N.3] The court closed, however, by stating that it had "weighed the balance of the probative value versus the prejudicial effect and the consumption of the court's time, and on that ground I am going to deny the motion to admit that evidence."

> [N.3] The court referred to the evidence as "Wheeler evidence," for *People v. Wheeler* (1992) 4 Cal.4th 284, in which the California Supreme Court clarified that nonfelony conduct involving moral turpitude is admissible to impeach a witness in a criminal case, subject to the court's discretion to exclude the evidence under Evidence Code section 352 if its probative value is substantially out-weighed by its potential for prejudice, confusion, or undue consumption of time. (*Wheeler*, at p. 295.)

On appeal, defendant contends the trial court "erred in several ways in regard to the molestation evidence." Specifically, defendant contends the trial court: (1) understated the importance of Juan's testimony to the prosecution's case; (2) "did not consider the impeachment value of the evidence for Christine"; (3) erroneously determined that the evidence would be unduly time consuming; (4) effectively "create[d] an automatic exclusion of evidence of prior sexual misconduct"; (5) "incorrectly held that the defense would have to prove the allegations of prior misconduct by a preponderance of the evidence"; and (6) "did not exercise its discretion under the law, relying instead on its prior position against the admission of *Wheeler* evidence." Defendant also suggests that the trial court's ruling violated his Sixth Amendment right to present a defense.

Notwithstanding defendant's seriatim challenges to the trial court's ruling, the issue before us can be framed much more simply, as follows: Did the trial court abuse its discretion in excluding evidence of the alleged molestation under Evidence Code section 352 on the ground that the probative value of the evidence was outweighed by the danger of undue prejudice and the fact that its admission would necessitate undue consumption of time? We conclude the answer to that question is "no."

In *Wheeler*, the Supreme Court explained the task faced by a trial court considering the admission of evidence of prior acts of moral turpitude to impeach a witness in a criminal case, as follows: "When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. In general, a misdemeanor—or any other conduct not amounting to a felony—is

a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler*, *supra*, 4 Cal.4th at pp. 296–297.)

Here, the trial court carefully conducted the analysis required by Wheeler and reasonably determined that the probative value of the evidence that Juan allegedly molested his stepdaughter was outweighed by considerations of undue prejudice and undue consumption of time. The trial court did not, as defendant asserts, create an automatic exclusion of evidence of prior sexual misconduct or refuse to exercise its discretion by relying on a preconceived animosity toward this type of impeachment evidence. Rather, the court accurately determined that allegations of sexual molestation of a minor in a case that has nothing to do with that subject would create a very real possibility of undue prejudice. More important, the court recognized that allowing defendant to elicit evidence relating to the molestation allegations would have required the People to respond with a substantial amount of additional evidence seeking to refute those allegations. Based on defense counsel's offer of proof, defendant wanted to present evidence that Christine's daughter accused defendant of certain inappropriate touching and that Christine told the police investigator that Juan reluctantly admitted to her that he touched the child, although Juan denied to the investigator that he touched her with any sexual intent. If that evidence had been admitted, the People could have been expected to examine both Juan and Christine at length about what happened, as well as what they told the investigator and why. The People also could have been expected to call the alleged victim to testify about what happened, as well as what she told the investigator and why. And in the end, there was no guarantee, or even a reasonable expectation, that there would have been sufficient evidence to convince the jury that Juan molested Christine's daughter or that Christine lied about it—both acts of moral turpitude.

Under these circumstances, the trial court did not abuse its discretion in refusing to admit evidence regarding the alleged molestation. We likewise conclude that the exclusion of this evidence did not violate defendant's constitutional right to present a defense.

## B

### *Prior Litigation*

In his motions in limine, defendant sought the admission of evidence of certain prior civil litigation relating to Juan's construction business. According to defendant, in 1993 an individual (Greenough) sued the Trejos for breach of contract. A settlement was reached, but (according to defendant) Juan failed to

abide by its terms. Thereafter, in 1994, Greenough obtained a judgment against the Trejos in the amount of $52,876.74. About five months later, the Trejos quitclaimed certain real property in Santa Clara to Juan's mother. [N.4] Greenough's attorney attempted to enforce the judgment, but the Trejos refused to provide a list of their assets and thereafter obtained a discharge in bankruptcy in December 1995.

> [N.4] In fact, the quitclaim deed showed it was executed in April 1992 but not recorded until April 1995.

Defendant argued that the foregoing evidence should be admitted for impeachment because "[r]eneging on a settlement agreement is ... an act of moral turpitude." Defendant also argued that Christine had denied she had any interest in Juan's construction business but the court found otherwise. Finally, defendant suggested that the Trejos had committed an act of moral turpitude by refusing to provide a list of their assets and by transferring property to Juan's mother "for no consideration." Defendant represented that he would call Greenough's attorney to testify on the matter.

At the hearing on the in limine motions, the People asserted that the prior litigation was "remote" and that if the evidence came in, it would "have to be rebutted." Defense counsel argued that what he wanted to present was the "sequential time line in terms of when the judgment was entered, when Mr. Trejo declared bankruptcy and when the property was quit claimed because that is a pretty clear trail." In effect, as the trial court later clarified, defense counsel wanted to "prove a fraudulent transfer."

The trial court ruled that the evidence was barred by section 1101, subdivision (b) of the Evidence Code because it was "conduct on a single occasion that is to be used to show bad character or disposition to commit certain acts." The court also ruled under Evidence Code section 352 that the prior incident was "so remote in time and ... so susceptible of leading this off on an area that has little if anything to do with the facts of this case." Accordingly, the trial court denied defendant's motion to admit the evidence.

On appeal, defendant contends the trial court "erred in its relevancy determination" because "[u]nder Evidence Code section 1100, specific instances of misconduct are admissible to prove a witness's character trait." Defendant also contends the court abused its discretion in excluding the evidence under Evidence Code section 352 because the incident was not remote when compared to "the past history between the Trejos and Mr. Fishman" and because presentation of the evidence would have taken less than an hour in a trial that lasted over three weeks.

We conclude the trial court did not abuse its discretion in excluding the evidence under Evidence Code section 352. [N.5] As for the issue of remoteness, the proximity of the prior incident to the outset of defendant's relationship with the Trejos is immaterial. What mattered here was the proximity of the prior incident to the time of trial. Recall that defendant sought to use this evidence to impeach

the Trejos' anticipated testimony by showing prior acts of moral turpitude, which (in his view) would have given the jury a reason to doubt the veracity of their testimony. The trial court did not act unreasonably in determining that the alleged transfer of property to avoid enforcement of a money judgment in 1995 was remote for purposes of impeaching the Trejos' testimony at a trial over 15 years later.

> [N.5] Because of this conclusion, we need not address the alternate basis the trial court offered for excluding the evidence.

Also, it was not unreasonable for the trial court to determine (implicitly) that presentation of evidence relating to the prior litigation would have necessitated an undue consumption of time and created a danger of confusing the issues or misleading the jury. By his offer of proof, defense counsel indicated he wanted to offer the testimony of Greenough's attorney essentially to prove that the Trejos fraudulently transferred real property to Juan's mother without consideration to protect the property from enforcement of the judgment. The quitclaim deed, however, showed that it was signed three years before it was recorded, well before the judgment. In the trial court, defense counsel asserted his belief that the date of the signature was "a fraudulent act also and bankruptcy fraud." Under these circumstances, the People reasonably could have been expected to respond to the introduction of the testimony about the underlying litigation and the quitclaim deed by eliciting further evidence from other witnesses about the circumstances in which the deed was made, whether there was consideration to support it, and related matters, all in an effort to refute any conclusion that the transfer was fraudulent. Under these circumstances, the risk of undue consumption of time and diverting the jury from the issues in the case, combined with the remoteness of the prior incident, reasonably justified the trial court's decision to exclude the evidence of the prior litigation.

<u>Fishman</u>, 2013 WL 542032 at **2–5.

As to petitioner's Sixth Amendment right to adequate cross-examination, this evidence was only marginally relevant and would have posed an undue risk of harassment, prejudice and confusion of the issues. The probative value of this evidence related only to the credibility of the Trejos. Indeed, Mr. Trejo, the target of the molestation allegations, was not even at the scene or house at the time of the attack. With regard to the Greenough litigation, petitioner was not a party to that lawsuit and thus the relevance of that lawsuit is also remote. Additionally, both pieces of evidence would require proof that they actually occurred. The allegations of molestation against Mr. Trejo were never decided before a trier of fact. The alleged victim recanted the allegations and Mrs. Trejo stood firm claiming the incidents never happened. As to the Greenough litigation,

petitioner's trial counsel intended to prove at trial that the Trejos completed a fraudulent transfer shortly before filing for bankruptcy.  In essence mini trials on this evidence would have had to occur and there was substantial risk for misleading the jury and confusing the issues.  The cross-examination sought is the epitome of an undue taking of time to accomplish it, as well as the injection of undue prejudice.

Petitioner's counsel cross-examined Mr. Trejo with prior inconsistent statements as well as describing the context of the litigation involving petitioner.  In addition, Ms. Trejos was cross-examined with e-mails she had sent regarding the subject matter of the criminal prosecution here in question.   The focus of the court's inquiry is to determine whether the exclusion of the evidence was AEDPA unreasonable.  Given the thoughtful consideration of the cross-examination issues here, and the allowable exceptions to unfettered cross-examination, petitioner reasonably had an opportunity for effective cross-examination without mention of the molestation allegations and the Greenough litigation.  Certainly the state courts were not unreasonable in their conclusion to exclude the proffered impeachment.

### 2.   Ms. Trejo's Emails Sent Through Her Work Server

Petitioner contends his Fourteenth Amendment right, and perhaps his Sixth Amendment right by extension, were violated by the trial court's decision not to disclose "'all' of the public e-mails of his accuser . . . ."  (ECF No. 1, at 9).  The Court of Appeal rejected this claim on direct appeal, stating as follows:

> This case originally was assigned to Judge Mark Curry for all purposes. On August 23, 2010, defense counsel disqualified Judge Curry under Code of Civil Procedure section 170.6. Two days later, Christine Trejo, who was employed in the family law department of the court, used the court's e-mail system to exchange some e-mails with Judge Curry's courtroom clerk about the disqualification and what would happen next.
>
> After Judge James Garbolino was assigned to the case in Judge Curry's place, he apparently learned of the e-mails and disclosed them to both sides. In their motions in limine, the People moved to exclude the e-mails as irrelevant. For his part, defendant moved to admit the e-mails as impeachment evidence, claiming they showed Christine was "using her position as an employee at the Placer County Superior Court in order to inappropriately exert her influence in the case," which defendant asserted was "an act [of] moral turpitude." Defendant also requested discovery of "[a]ll e-

18

mails from Christine Trejo's work e-mail at the Placer County Superior Court regarding [his] current criminal case."

The court (Judge Garbolino) determined that Christine's "actions [we]re susceptible of inquiry to determine whether or not anything ha[d] occurred which could or might influence the outcome of this case within the system." Accordingly, on October 27, 2010, the court ordered that "all communications originated by [Christine] through the Placer County Superior Court e-mail system commencing with September 16, 2009 [the date of the underlying incident], be made available to the court in camera." In its order, the court stated that after identifying "any e-mails ... wherein the subject matter of the case is mentioned in any manner," the court would "determine if there is any potential issue regarding privacy or confidentiality." The court would then reveal all of the e-mails to Christine's attorney and entertain any claim of privilege as to those e-mails. The court "retain[ed] the discretion to invite all counsel to brief and argue the applicability of privilege to any communications otherwise deemed potentially relevant by the court." After culling out any e-mails the court determined were privileged, the court would then release any potentially relevant but unprivileged e-mails to the parties.

Ultimately, the court identified numerous e-mails "that arguably related to the Fishman case." Among those, the court identified over 40 e-mails as containing privileged communications between Christine and her attorney. The court also identified one e-mail from Christine to the court's human resources department that contained health-related privileged information. (That e-mail "dealt with [Christine's] communication to HR concerning health issues and available employee benefits.") After his review of those e-mails, Christine's attorney claimed privilege, and the court sustained that claim. Accordingly, the court did not turn the privileged e-mails over to the parties, but did turn over an unidentified number of potentially relevant e-mails that were not privileged.

In July 2011, defendant's appellate counsel filed an application to augment the record on appeal. Among other things, he asked that the clerk's transcript be augmented to include "[t]he emails obtained by the trial court as a result of its Order dated October 27, 2010." Specifically, he requested that the e-mails disclosed to the parties should be made part of the record on appeal and the e-mails withheld as privileged should be forward to this court under seal.

We granted defendant's motion to augment. Because the original printouts of the privileged e-mails the trial court had reviewed had not been preserved, the court had to "reconstruct the group of privileged emails from the database used prior to trial." The court was able to retrieve all of the e-mails that had been withheld on the basis of attorney-client privilege but was unable to locate the one e-mail that had been withheld as containing privileged health information.

On appeal, defendant asserts that the "[t]he trial court erred in holding that [Christine] had any privilege to prevent the disclosure of her emails, which had been sent over the government email."

* * *

[A]s we have noted already, defendant asserts that "[t]he trial court erred in holding that [Christine] had any privilege to prevent the disclosure of her emails, which had been sent over the government email." In other words, he claims that the circumstances of Christine's communications with her attorney prevented the attorney-client privilege from attaching to those communications. In support of this claim of error, defendant relies solely on *Holmes v. Petrovich Development Company, LLC* (2011) 191 Cal.App.4th 1047, which he contends held that "a person, who knows that the computer used [to send e-mail] is not secure and may be examined in the normal course of business, has waived any privilege to the contents of the transmittal." That was not the holding in *Holmes*, however. In *Holmes*, this court held that an employee could not claim attorney-client privilege over e-mails she sent to her attorney over her employer's computer "after being warned that [the computer] was to be used only for company business, that e-mails were not private, and that the company would randomly and periodically monitor its technology resources to ensure compliance with the policy." (*Id.* at pp. 1068–1069.)

Here, defendant points to no similar evidence about the policies governing the court's computer system and what Christine knew about those policies. Furthermore, defendant points to nothing in the record to show that he ever challenged the trial court's determination that the e-mails were privileged. Had he done so, perhaps the record would have been more developed on the circumstances surrounding Christine's use of the court's computer system to communicate with her attorney. As it is, the record on appeal contains no such information.

It is fundamental that a judgment challenged on appeal is presumed correct and the appellant bears the burden of affirmatively demonstrating error. (*E.g.*, *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549.) Here, defendant seeks to show that under the principles set forth in *Holmes*, the trial court erred in sustaining Christine's claim of privilege as to her communications with her attorney using the court e-mail system. To make that showing, defendant would have to point to evidence demonstrating that Christine had reason to know that her communications with her attorney over that e-mail system would not be confidential. He has not done so. All we know is that Christine used her employer's e-mail system. That is not enough to carry defendant's burden of affirmatively demonstrating trial court error in sustaining Christine's claim of privilege.  Accordingly, we find no such error. [N.7]

> [N.7] In reaching this conclusion, the content of the e-mails that were withheld as privileged is irrelevant. Accordingly,

we need not review the e-mails themselves to reject defendant's claim of error.

Fishman, 2013 WL 542032 at **5–7.

Petitioner contends the trial court's refusal to disclose to the parties Ms. Trejo's emails with her attorney violated his right to present a defense.  As explained above, judges may exclude evidence that is repetitive.  Holmes, 547 U.S. at 326–27.  The emails petitioner seeks here are merely repetitive and cumulative evidence attacking Ms. Trejo's credibility.  At trial, petitioner's counsel made clear that Ms. Trejo's credibility was central to the case.  Petitioner's counsel attacked that credibility with, among other things, numerous *disclosed* emails Ms. Trejo sent to a Placer County courtroom clerk requesting information regarding the case.  Petitioner's counsel argued that the emails created an appearance of impropriety and that Ms. Trejo, as an employee of the court, knew this contact was improper.  As a result, petitioner was given an opportunity to present a complete defense—that Ms. Trejo was a liar, evidenced by her allegedly improper contacts with other Placer County Superior Court personnel.  Petitioner is not entitled to relief on this claim simply because a few privileged emails were not disclosed.

The application of the attorney-client privilege in this case was not disproportional to the need to present a defense in this case, and thus did not run afoul of Holmes.  That the attorney-client privilege applied to the undisclosed emails is a matter of state law determined by the state courts after *in camer*a review.  Nothing in the context of the facts, or the case law requiring this court to be bound by rulings on state law,  Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602 (2005), would permit this federal court to arrive at an opposite conclusion.  Moreover, the privilege is a weighty one and should not be dismissed simply because an opponent thinks his impeachment case might get better if these privileged communications were to be disclosed.

All evidentiary claims should be denied.

IV.     Restitution

Petitioner contends the trial court's restitution order violates the 14th Amendment.  As respondent notes, it appears this claim is unexhausted because petitioner did not present it to the California Supreme Court.  See Resp't's Lod. Doc. 5.  Nevertheless, the court may deny an

1   unexhausted claim on the merits without regard to a petitioner's failure to exhaust.  28 U.S.C. §

2   2254(b)(2); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (holding that an unexhausted

3   petition may be denied on the merits "when it is perfectly clear that the applicant does not raise

4   even a colorable federal claim").  As such, the court denies this unexhausted claim on the merits

5   because an order to pay restitution is not cognizable on federal habeas review as it does not affect

6   the fact or duration of petitioner's sentence.  See United States v. Thiele, 314 F.3d 399, 401–02

7   (9th Cir. 2002) (finding challenge to restitution fine not cognizable on habeas review).

8   V.      Motion for Discovery

9           In conjunction with his traverse, petitioner filed a motion for discovery regarding

10  respondent's assertions that 1) the state court's decision upholding the exclusion of impeachment

11  evidence was not unreasonable application of clearly established federal law, and 2) the state

12  court's decision upholding the trial court's ruling on Christine Trejo's privilege objection to

13  disclosure of her employee emails was not an unreasonable application of clearly established

14  federal law.  Because the court denies petitioner's claims for the reasons discussed above,

15  petitioner's motion for discovery is denied.[3]

16  CONCLUSION

17          Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

18  issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A

19  certificate of appealability may issue only "if the applicant has made a substantial showing of the

20  denial of a constitution right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in this Order, a

21  substantial showing of the denial of a constitutional right has not been made in this case.

22          Accordingly, IT IS HEREBY ORDERED that:

23          1.  Petitioner's motion for discovery is denied;

24          2.  Petitioner's application for a writ of habeas corpus (ECF No. 1 ) is denied;

25          3.  This case is closed; and

26  _____

27  [3]  Again, this court could not invalidate the state court's finding that the attorney-client privilege
    applied; discovery would not alter that fact.  Nor would discovery be permitted under the
    principles of Cullen v. Pinholster, 131 S.Ct. 1388 (2011).  See Lewis v. Ayers, 2011 WL 2260784
28  (E.D. Cal. 2011).

4.   The court declines to issue a certificate of appealability referenced in 28 U.S.C. §

2253.

Dated: March 25, 2015

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:016/Fish2421.hc